**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEW JERSEY**
Caption in Compliance with D.N.J. LBR 9004-2(c)

David M. Friedman
Robert M. Novick
Jeffrey R. Gleit
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
Telephone:  (212) 506-1700
Telecopy:  (212) 506-1800
Email: rnovick@kasowitz.com

-and-

Charles A. Stanziale, Jr.
Jeffrey T. Testa
McElroy, Deutsch, Mulvaney & Carpenter, LLP
Three Gateway Center, 100 Mulberry Street
Newark, NJ 07102
Telephone: (973) 565-2051
Telecopy: (973) 622-5314
Email: cstanziale@mdmc-law.com
        jtesta@mdmc-law.com

Co-counsel for Reorganized Debtors

| | |
|---|---|
| In Re:<br>THCR/LP CORPORATION, et al.,<br><br>Debtors. | Chapter 11<br>Case Nos.: 04-46898 (JHW)<br>through 04-46925 (JHW)<br><br>Jointly Administered |
| TRUMP HOTELS AND CASINO RESORTS, INC., TRUMP HOTELS AND CASINO RESORTS HOLDINGS, L.P., TRUMP PLAZA ASSOCIATES, TRUMP TAJ MAHAL ASSOCIATES, TRUMP ATLANTIC CITY ASSOCIATES, and TRUMP CASINO HOLDINGS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>DLJ MERCHANT BANKING PARTNERS III, L.P.<br><br>Defendants. | Adv. Proc. No. _____ (  ) |

**REORGANIZED DEBTORS' COMPLAINT FOR THE AVOIDANCE OF
FRAUDULENTLY INCURRED OBLIGATIONS AND TRANSFERS TO DLJ
MERCHANT BANKING PARTNERS III, L.P. OR, ALTERNATIVELY, FOR BREACH
OF CONTRACT AND OTHER DUTIES, TOGETHER WITH OBJECTIONS AND
<u>COUNTERCLAIMS TO DEFENDANTS' CLAIMS</u>**

Trump Hotels & Casino Resorts, Inc. ("THCR"), Trump Hotels & Casino Resorts

Holdings, L.P. ("THCR Holdings"), Trump Plaza Associates, Trump Taj Mahal Associates ("Taj

Mahal"), Trump Atlantic City Associates ("TAC"), and Trump Casino Holdings, LLC ("TCH")

(collectively, the "Trump Parties"; together with their non-plaintiff reorganized debtor affiliates,

the "Debtors"), as reorganized debtors, on behalf of themselves and their estates, allege for their

complaint against DLJ Merchant Banking Partners III, L.P. ("DLJ") as follows:

## I.

## NATURE OF THIS ACTION

1.      DLJ spent nearly a year considering whether it wished to play the role of "white

knight" in the Debtors' recapitalization, preventing the Debtors from soliciting or negotiating

alternative restructuring proposals with other parties throughout much of that time, only to

arbitrarily terminate all discussions and abandon the Debtors to a deep liquidity crisis and an

uncertain fate.   For having done nothing for the Debtors except waste precious time and impair

their ability to solicit and negotiate offers with parties that might have pursued a restructuring

transaction in good faith, DLJ has already received payments of nearly $2.4 million.  Rather than

wisely creep away with that unearned sum, DLJ has filed proofs of claim[1] (collectively, the "DLJ

Claims") asserting that it should be paid an additional $26 million by the Debtors as a perverse

reward for having left them with no option but to enter into a hastily crafted stand-alone plan

with its existing creditors to avert a free-fall liquidation after DLJ unilaterally terminated

discussions.

2.      The DLJ Claims must be disallowed and expunged for multiple reasons.

Foremost among them is that the Third Circuit Court of Appeals has established that potential

financiers who window-shop without committing to fund do not provide reasonably equivalent

_____

[1] The DLJ Claims are proofs of claim numbers 1645, 1909, 1910, 1911 and 1912.

value to support the payment of large fees by an insolvent debtor.  The unconscionable Letter

Agreements (defined below), pursuant to which DLJ alleges that it is entitled to another $26

million, provided no value or consideration whatsoever to the Debtors because they never bound

DLJ to consummate or pursue any transaction, or do or refrain from doing anything at all.  The

Letter Agreements, and any alleged fee obligations of the Trump Parties thereunder, therefore

summarily should be avoided as constructively fraudulently obligations.  Furthermore, because

there is a complete lack of consideration running from DLJ to the Debtors under the Letter

Agreements, the Letter Agreements are not enforceable under general principles of contract law

even outside of the context of an insolvency proceeding.

3.        Alternatively, even if DLJ somehow is found to have agreed to provide

reasonably equivalent consideration or value to the Trump Parties in exchange for their

incurrence of $28.4 million of obligations and that the Letter Agreements are theoretically

enforceable, the DLJ Claims still must be disallowed because (a) the contractual prerequisites to

DLJ earning a Transaction Fee under the terms of the Letter Agreements were not satisfied on

their face because a qualifying "Alternative Transaction" did not occur at all, let alone within the

required time frame; (b) DLJ's abandonment of the restructuring transaction constituted a breach

of its duties of good faith and fair dealing; and (c) the Trump Parties were fraudulently induced

to incur their alleged obligations to DLJ by DLJ's false and misleading representations that it

would pursue consummation of a restructuring transaction in good faith.

4.        By proposing, but never firmly committing, to serve as the Trump Parties' white

knight, and subsequently abandoning the proposed transaction for no cause, DLJ did not provide

a scintilla of value to the Trump Parties or their estates.  To the contrary, DLJ damaged the

estates by misrepresenting that it would pursue a restructuring transaction in good faith, to

induce the Debtors to agree not to solicit and negotiate restructuring transactions with other

parties, and pay DLJ gargantuan fees, and then callously abandoning the Debtors.  The DLJ

Claims therefore must be disallowed and expunged in their entirety.

## II.

## THE PARTIES

### A.    The Victims

5.    Plaintiff THCR is a Delaware Corporation with its principal place of business at

1000 Boardwalk, Atlantic City, New Jersey 08401.

6.    Plaintiff THCR Holdings is a Delaware limited partnership with its principal

place of business at 1000 Boardwalk, Atlantic City, New Jersey 08401.

7.    Plaintiff Trump Plaza Associates is a New Jersey general partnership with a

business address of Mississippi Avenue and the Boardwalk, Atlantic City, New Jersey 08401.

8.    Plaintiff Taj Mahal is a New Jersey general partnership with a business address of

1000 Boardwalk, Atlantic City, New Jersey 08401.

9.    Plaintiff TAC is a New Jersey general partnership with a business address of 1000

Boardwalk, Atlantic City, New Jersey 08401.

10.    Plaintiff TCH is a Delaware limited liability company with a business address of

Huron Avenue at Brigantine Boulevard, Atlantic City, New Jersey 08401.

11.    Each of the plaintiffs is a reorganized debtor in the-above captioned chapter 11

cases.

### B.    The Wrongdoers

12.    Defendant DLJ is a Delaware limited partnership with a business address at 11

Madison Avenue, New York, NY 10010.  DLJ is owned and controlled by Credit Suisse First

Boston, Inc. ("CSFB"). Upon information and belief, at all times relevant to this complaint the

managing general partner of DLJ was DLJ Merchant Banking III, Inc., which also has a business

address at 11 Madison Avenue, New York, NY 10010, and is also owned and controlled by

CSFB.

## III.

## <u>JURISDICTION AND VENUE</u>

13.    On November 21, 2004 (the "Petition Date"), the Trump Parties filed chapter 11

petitions in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy

Court"), commencing the above-captioned jointly administered chapter 11 cases (the "Chapter

11 Cases").  DLJ filed proofs of claim and substantive pleadings, and appeared in the Chapter 11

Cases.

14.    The Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C.

§§ 1331, 1334(b) and 1334(e), Article IX of the Second Amended Joint Plan of Reorganization

of THCR/LP Corporation, et al. Dated as of March 30, 2005 (the "Plan") and paragraph CC of

the (1) Amended Order Confirming Second Amended Joint Plan of Reorganization of THCR/LP

Corporation et al. Dated as of March 30, 2005, and (2) Findings of Fact and Conclusions of Law,

dated April 11, 2005.   The claims alleged herein are core proceedings under 28 U.S.C. §§

157(b)(2)(B), (C), (E), (F), (H) and (O).

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a

substantial part of the events or omissions giving rise to the claims alleged herein occurred in this

District, and pursuant to 28 U.S.C. § 1409(a) because this is a proceeding arising under title 11

of the United States Code or arising in or related to a case under title 11 of the United States

Code.

## IV.

## FACTUAL ALLEGATIONS

### A.    Liquidity and Competitive Pressures Require the Trump Parties to Restructure

16.    During 2003, deteriorating operating results, excessive leverage, high energy and gasoline prices, and loss of market share to competitors led the Trump Parties to conclude that it would be necessary for them to undergo a restructuring, possibly in connection with a third-party equity investment, in order to have sufficient cash flows to fund their operating expenses, necessary capital expenditures, and debt service obligations.  The Trump Parties' senior management therefore contacted approximately twenty-five potential strategic and financial investors and also consulted with several investment banks regarding their prospects for obtaining the additional capital required by their business.

### B.    DLJ Dons A Suit of White Armor

17.    During the third quarter of 2003, DLJ expressed to the Trump Parties that it would be interested in proposing a restructuring transaction (the "Proposed Restructuring Transaction") that would include a significant equity investment by DLJ as part of a recapitalization of the Debtors.  On September 29, 2003, THCR entered into a confidentiality agreement with DLJ, pursuant to which THCR agreed to make certain confidential information available to facilitate DLJ's interest in proposing an equity investment.  DLJ then proceeded to conduct several months of due diligence work, which included discussions with the Debtors' senior management, review of the Debtors' operating strategies, and other legal and financial due diligence.  In addition, DLJ and its financial and legal advisors held a series of meetings with the Debtors and their advisors concerning the terms and implementation of a possible restructuring of the Debtors' debt obligations and a recapitalization of the Debtors' capital structure.

6

### C.    <u>DLJ Requires the Trump Parties to Make It Their Exclusive Suitor</u>

18.      By mid-January, 2004, DLJ had spent more than three months performing due diligence and informed the Trump Parties that it intended to proceed in good faith toward negotiating and consummating a transaction, subject only to confirmatory due diligence.  On January 20, 2004, DLJ further led the Trump Parties to believe that DLJ had determined to pursue a transaction by requiring THCR to execute an exclusivity agreement (the "Exclusivity Agreement") that restricted THCR and its affiliates and representatives from soliciting, participating in negotiations with, or furnishing nonpublic information to any party other than DLJ regarding a potential recapitalization of the Debtors, including parties with which the Debtors had already begun discussions, for the following 60 days (*i.e.*, through March 21, 2004). DLJ informed the Trump Parties that it would cease further discussions about the potential equity investment unless it was given the exclusive opportunity to have such discussions.

19.      The Exclusivity Agreement provided, *inter alia*, that THCR would provide DLJ with access to the Trump Parties' properties, books, records and documents; and that THCR would reimburse DLJ for certain transaction expenses only in the event a restructuring transaction were to be consummated or they breached the Exclusivity Agreement.  Section 3 of the Exclusivity Agreement also contained a confidentiality provision that limited the Trump Parties' ability to disclose the Exclusivity Agreement.  Section 3 provided, in relevant part:

> This Agreement is intended to be confidential and its existence shall not be disclosed by DLJ or the Company to any person unless required by law or the rules or regulations of the New York Stock Exchange or unless requested by any regulatory agency, including but not limited to, any gaming authority or agency . . . .  In the event the Company determines that any public announcement of this Agreement is required, the Company shall afford DLJ the opportunity to review and comment on such public announcement prior to its release.  In any event, if any party discloses, without the prior written consent of the other parties, the fact that discussions concerning a Transaction between the parties are taking place or the status or terms of any possible Transaction to any person other than a Permitted Recipient, then DLJ (in the case of a disclosure by the Company . . . ) or (ii) the Company (in the case of a disclosure by DLJ

. . . ) may terminate discussions concerning the Transaction and the Exclusivity Period.

**D.      The Armor Is Tarnished:  DLJ's Misrepresentations Induce the Trump Parties to Agree to Pay DLJ $25 Million Plus Fees In Exchange for Nothing**

20.      On February 12, 2004, DLJ insisted that as a prerequisite to DLJ moving forward with a transaction, the Trump Parties execute documents styled "Letter Agreements" (collectively, the "Original Letter Agreement").  The Original Letter Agreement states, in essence and with certain very limited exceptions, that the Trump Parties, except for THCR Holdings, shall be required to pay DLJ a $25 million fee (the "Transaction Fee"), plus up to $5 million of expenses, in the event they consummate a restructuring transaction having a value to THCR in excess of $200 million with any party other than DLJ, so long as the terms of the alternative transaction are in place by or before December 1, 2004.  In contradistinction to a legitimate "stalking horse" or "break-up fee" agreement, the Original Letter Agreement did not bind DLJ to pursue consummation of a transaction with the Debtors or even to continue *discussions* with the Debtors, in exchange for the tremendous potential Transaction Fee.  Thus, the Original Letter Agreement imposed no obligations whatsoever upon DLJ, while it purportedly required the Trump Parties, other than THCR Holdings, to pay DLJ $25 million to $30 million if they did not do a deal with DLJ.  If DLJ whimsically terminated discussions minutes after the Original Letter Agreement was executed, the Debtors nevertheless would be obligated under the terms of the Original Letter Agreement to pay DLJ at least $25 million when they entered into an alternative restructuring transaction.  (It was obvious by this time that the Debtors had to enter into *some* restructuring transaction, such that if they did not enter into one with DLJ they would have to enter into one with some other party.)  Thus, even if the Debtors sought to consummate a transaction with DLJ, and DLJ simply declined without explanation, DLJ would become entitled to at least a $25 million payment if an "Alternative Transaction" were to occur on or prior to December 1, 2004 (the "Tail Period").

21.    The Original Letter Agreement defined an Alternative Transaction as follows:

An "Alternative Transaction" will occur when the Company [THCR], any of its subsidiaries or any of its controlled affiliates enters into a definitive agreement (including an agreement subject to court approval), files a voluntary plan of reorganization with a court or files an exchange offer registration statement with the SEC, in each case with respect to:

•    Any transaction described in any of subparagraphs (a)(i)-(iii) which has an effect described in subparagraph (b), and

•    Any transaction described in subparagraph (a)(iv),

in each case whether consummated out-of-court or through a bankruptcy proceeding, **without the participation of DLJMB** or any of its affiliates (other than CSFB and its affiliates in connection with advisory or financing activities):

(a) (i) any direct or indirect sale, whether by sale of equity or substantially all the assets, merger or consolidation (including, without limitation, any sale pursuant to Section 363 of title 11 of the United States Code (the "Bankruptcy Code")) of the Company, any of its subsidiaries or any of its controlled affiliates, (ii) any sale of securities of the Company, and of its subsidiaries or any of its controlled affiliates, (iii) any restructuring of indebtedness of the Company, any of its subsidiaries or any of its controlled affiliates, including without limitation, the filing of a plan of reorganization under Chapter 11 of the Bankruptcy Code; or (iv) any person other than Donald J. Trump, his spouse and his legal heirs and legatees (the "Trump Group") shall acquire and own, directly or indirectly, in the aggregate a greater percentage of the Voting Stock of the Company than the Trump Group (other than pursuant to or resulting from the confirmation of a plan of reorganization under Chapter 11 of the Bankruptcy Code that is not proposed by the Company);

(b)  Any such transaction shall have (x) **a value in excess of $200 million to the Company, any of its subsidiaries, or any of its controlled affiliates**, it being understood that for such purposes, value shall mean the aggregate dollar amount of proceeds received and net indebtedness assumed, forgiven or compromised or (y) shall result in the ownership of more than 50% of the voting stock or control of the board of directors of any subsidiary or controlled affiliate of the Company with an asset fair market value of in excess of $200 million.

22.    Under the terms of the Original Letter Agreement, the $25 million Transaction

Fee that DLJ insisted upon amounted to 12.5 percent of the minimum transaction value that

could qualify as an Alternative Transaction.   By insisting that the Trump Parties enter into the

Original Letter Agreement that could provide DLJ with the obscenely large Transaction Fee,

DLJ knew or should have known that the Trump Parties would believe that DLJ was committed

to pursuing a restructuring transaction in good faith, and would rely on that belief as the basis for determining to execute the Original Letter Agreement.  Indeed, oral communications by DLJ to the Trump Parties confirmed DLJ's commitment.

23.    The Exclusivity Agreement, but not the Original Letter Agreement, expired in accordance with its terms on or about March 19, 2004, leaving the Debtors free to solicit offers from and negotiate with other parties.  On August 9, 2004, THCR and DLJ entered into a Second Exclusivity Agreement (the "Second Exclusivity Agreement"), which reinstated the Exclusivity Period through the earlier of December 31, 2004 or the filing of a chapter 11 case by the Trump Parties.  DLJ had informed the Trump Parties that it would not continue to pursue a restructuring transaction unless the Trump Parties executed the Second Exclusivity Agreement.

24.    As an exhibit to the Second Exclusivity Agreement, DLJ and the Trump Parties documented their agreement as to certain material terms that would provide the basis for a restructuring of the Debtors in the event such a restructuring were to occur (the "DLJ Restructuring Term Sheet").  The DLJ Restructuring Term Sheet included a $400 million equity investment by DLJ in exchange for new common stock of THCR.  A portion of the proceeds from the equity investment were to constitute part of the consideration to be provided to the holders of certain First Priority Mortgage Notes issued by TAC and its affiliates, and certain of the First Priority and Second Priority Mortgage Notes issued by TCH and Trump Casino Funding, Inc. ("TCF").  Another portion of the proceeds would be used to fund the Debtors' ongoing business operations and capital expenditures.  Id.  Additionally, DLJ agreed, in its capacity as a holder of the Second Priority Mortgage Notes, to vote for any plan of reorganization proposed by THCR on terms materially consistent with the DLJ Restructuring Term Sheet.  Id.

25.    The Second Exclusivity Agreement, like the Exclusivity Agreement and the Original Letter Agreement, did not explicitly obligate DLJ to pursue in good faith a transaction

based upon the DLJ Restructuring Term Sheet. However, by insisting that THCR enter into the

Second Exclusivity Agreement, DLJ again knew or should have known that the Trump Parties

would believe that DLJ was committed to pursuing a restructuring transaction in good faith, and

would rely on that belief as the basis for determining to execute the Second Exclusivity

Agreement. Again, oral communications by DLJ to the Trump Parties confirmed that

commitment.

26.    Also on or as of August 9, 2004, all of the Trump Parties entered into a Letter

Agreement Amendment (the "Amended Letter Agreement" and together with the Original Letter

Agreement, the "Letter Agreements") with DLJ. The Amended Letter Agreement extended the

Tail Period from December 1, 2004 through June 30, 2005. In addition, the Amended Letter

Agreement provided that the Trump Parties, other than THCR Holdings, would reimburse DLJ

for up to $5 million in expenses in connection with the Proposed Restructuring Transaction (the

"Expenses").

27.    DLJ provided no consideration to the Trump Parties in exchange for the seven-

month extension of the Tail Period or the enhanced obligations to pay Expenses. The Amended

Letter Agreement did not explicitly require DLJ to pursue in good faith the Proposed

Restructuring Transaction. However, DLJ knew or should have known that its insistence that the

Trump Parties enter into the Amended Letter Agreement would cause them to believe that DLJ

was committed to pursuing the Proposed Restructuring Transaction in good faith, and would rely

on that belief as the basis for determining to execute the Amended Letter Agreement. Once

again, oral communications by DLJ to the Trump Parties confirmed that commitment.

28.    On August 16, 2004, each of the Trump Parties and DLJ entered into identical

Escrow Agreements (collectively, the "Escrow Agreement"), pursuant to which the Trump

Parties transferred $2,379,966 (the "Escrow Amount") into an escrow account for the benefit of

DLJ to cover DLJ's expenses with respect to the Proposed Restructuring Transaction.

**E.** **The Armor is Blackened:  DLJ Jeopardizes the Trump Parties' Future by Unilaterally Terminating Discussions for No Cause, and Seeks $28.4 Million for Providing this Disservice**

29.     At the time DLJ insisted that the Trump Parties enter into the Original Letter Agreement, DLJ had the benefit of more than four months of due diligence with respect to the Trump Parties and their businesses.  At the times that DLJ insisted that the Trump Parties enter into the Amended Letter Agreement and the Escrow Agreement, DLJ had the benefit of approximately *ten months* of due diligence.  Yet barely five weeks thereafter, on September 22, 2004, DLJ informed the Trump Parties that it was terminating its discussions with the Trump Parties and would not enter into a restructuring transaction with them.  The following day, September 23, 2004, DLJ informed the escrow agent that it had terminated discussion and demanded the release of the Escrow Funds to DLJ.

30.     DLJ's decision to terminate negotiations, just weeks after having induced the Trump Parties to enter into the Amended Letter Agreement, the Second Exclusivity Agreement, and the Escrow Agreement (collectively, the "August 2004 Agreements") by manifesting an intent to pursue the Proposed Restructuring Transaction in good faith, astounded the Debtors.  DLJ had conducted nearly a year of due diligence; it did not discover any material adverse information about the Debtors or their businesses between the time of the August 2004 Agreements (including the DLJ Restructuring Term Sheet) and the September 22, 2004 notice of termination that it had not become aware of prior to the August 2004 Agreements through its lengthy due diligence process.

31.     The totality of circumstances demonstrate that DLJ misled the Debtors into believing that it intended to pursue a restructuring transaction in good faith to induce the Debtors to enter into the August 2004 Agreements, and possibly also the Original Letter Agreement, in

order to line its pockets with huge and totally underserved fees.   At the time the August 2004

Agreements were signed, DLJ had already decided that it was not going to go forward with a

restructuring transaction, but was merely perfecting and expanding its ability to assert claims for

the Restructuring Fee and Expenses.  Had the Trump Parties known of DLJ's true intentions,

they would never have executed the August 2004 Agreements.

32.    By inducing the Trump Parties to enter into the August 2004 Agreements, DLJ

harmed the Debtors by preventing them from soliciting genuine restructuring transactions -- with

parties who might have made a good faith effort to consummate a transaction rather than just use

non-binding discussions as an excuse to create claims for millions of dollars of fees -- at the time

that insolvency and illiquidity posed the greatest threat to the Debtors' future and ability to repay

creditors.

**F.    The Debtors Reorganize**

33.    On September 22, 2004, facing impatient creditors and salivating competitors, the

Debtors scrambled to create a new restructuring strategy after having been prohibited by DLJ

from negotiating with other parties.  The Debtors succeeded in reaching an agreement on terms

for a recapitalization with certain large noteholders, although not with many other significant

stakeholders.  However, the terms included higher interest rates than those that were

contemplated under the Proposed Restructuring Transaction, and hence the recapitalization was

materially less valuable to the Debtors than the Proposed Restructuring Transaction.

34.    On October 20, 2004, the Debtors entered into a "Restructuring Support

Agreement" with Donald J. Trump, some of the holders of the TAC First Priority Mortgage

Notes, and some of the holders of the First Priority and Second Priority Mortgage Notes issued

by TCH and TCF.  The Restructuring Support Agreement set forth some of the material terms

and conditions that were incorporated in the joint plan of reorganization and related disclosure

statement that the Debtors filed with the Bankruptcy Court on December 15, 2004 (the "First

Plan").

35.    On February 14, 2005, the Debtors filed an amended plan (the "Confirmed Plan")

and disclosure statement.  The Confirmed Plan was approved by the Bankruptcy Court on April

5, 2005, and consummated on or about May 20, 2005.

**G.    A Return to the Scene of the Crime:**
**DLJ Participates Extensively in the Debtors' Bankruptcy Proceedings**

36.    On or about January 18, 2005, DLJ filed the DLJ Claims in the Debtors'

bankruptcy cases.  In the DLJ Claims, DLJ asserts claims in the amount of $25 million for a

"Transaction Fee" plus over $1 million in unpaid "Transaction Expenses" (*i.e.*, in excess of the

$2.4 million Escrow Amount it had already received), notwithstanding that DLJ provided

absolutely no value to the Debtors, and in fact harmed them by abandoning negotiations after

having limited the Debtors' ability to negotiate with other potential suitors.  DLJ asserts in the

DLJ Claims that it is entitled to a $25 million Transaction Fee because, rather than simply turn

off the lights and close their doors when DLJ refused to provide financing, the Debtors

succeeded in obtaining the Restructuring Support Agreement on October 20, 2004, and filing of

their Initial Plan on December 15, 2004.  The DLJ Claims assert that the Transaction Fee became

payable upon the consummation of the Plan.

37.    During the chapter 11 cases, DLJ assumed the role of an active participant.  DLJ

filed the following with the Bankruptcy Court:  (1) Objection to Debtors' Disclosure Statement

[Docket No. 437]; (2) Notice of Appearance and Request for Service [Docket No. 477]; (3)

Application for Attorney Van C. Durrer, II to appear Pro Hac Vice [Docket No. 477], to

represent DLJ in the Bankruptcy Cases; (4) Application for Attorney Seth Goldman to Appear

Pro Hac Vice, to represent DLJ in the Bankruptcy Cases [Docket No. 571]; (5) Objection to

Confirmation of the Debtors' Amended Joint Plan of Reorganization [Docket No. 824] (the

"Confirmation Objection"); (6) Notice of Deposition of Debtors' Representative [Docket No.

873]; (7) Supplemental Notice Regarding Notice of Deposition of Debtors' Representative

[Docket No. 891]; (8) Emergency Motion to Compel Compliance with Deposition Notice With

Respect to Objection to Amended Joint Plan of Reorganization [Docket No. 894];  (9)

Application to Shorten Time [Docket No. 895]; and (10) Second Supplemental Notice Regarding

Notice of Deposition of Debtors' Representative [Docket No. 897].  In addition, counsel for DLJ

represented DLJ at multiple depositions, including the depositions of Donald J. Trump, Todd

Vannucci, and Barry W. Ridings.

38.     Upon information and belief, DLJ and/or its affiliates or successors also

participated in the reorganization transaction itself:  as the holders of THC Second Priority Notes

Claims, DLJ and/or its affiliates or successors received distributions pursuant to the

reorganization transaction effectuated by the Plan.

39.     As if it had not already done enough to imperil the Debtors' future, DLJ

attempted to prevent the Debtors from reorganizing by requesting, in its March 21, 2005

Confirmation Objection, the Bankruptcy Court to deny confirmation of the Plan.  DLJ argued in

the Confirmation Objection, among other things, that the Court should not confirm the Plan

because the Plan failed to provide for the payment of $26 million to DLJ.  See Confirmation

Objection at ¶ 17.   DLJ's objection to confirmation was rather perverse because the Letter

Agreements, which are attached to the DLJ Claims, provide that the Transaction Fee is not

payable unless the alleged Alternative Transaction were consummated, which required the

confirmation of the Plan.

40.     However, rather than risk the reorganization that the Debtors and their creditors

had been working so hard to accomplish, the Debtors and other parties in interest, entered into a

stipulation with DLJ, dated March 30, 2005 [Docket No. 950] (the "DLJ Stipulation"), pursuant

to which DLJ withdrew its Confirmation Objection in exchange for, *inter alia*, the Debtors'

waiver of rights to seek affirmative recoveries from DLJ for its conduct.

41.     The DLJ Stipulation also established procedural deadlines respecting the Debtors'

anticipated objection to allowance of the DLJ Claims.  Specifically, the DLJ Stipulation provided

for a "Standstill Period," during which the Debtors could not object to the DLJ Claims, that

would last until 60 days after the "Effective Date" of the Plan unless extended by the parties.

DLJ and the Debtors extended the Standstill Period until and through September 27, 2005.  Upon

the expiration of the Standstill Period, the Debtors have a 30-day period in which they may file

objections to the DLJ Claims, extending through October 27, 2005.  The Trump Parties have

timely commenced this adversary proceeding, which includes an objection to the DLJ Claims,

within the requisite time period.

## V.

## CLAIMS FOR RELIEF AND OBJECTIONS TO ALLOWANCE OF DLJ CLAIMS

42.     To the extent that any of the claims for relief, claim objections and/or allegations

set forth herein is inconsistent with one or more other claims for relief, claim objections, and/or

allegations, such claims for relief, claim objections, and/or allegations and are pled as alternative

pleadings as permitted by Rule 8(e)(2) of the Federal Rules of Civil Procedure, as made

applicable to this adversary proceeding by Rule 8 of the Federal Rules of Bankruptcy Procedure.

### FIRST CAUSE OF ACTION AND FIRST OBJECTION TO DLJ CLAIMS
### Fraudulent Transfer – Original Letter Agreement Obligations
### Bankruptcy Code Sections 548, 550, 551

43.     The Trump Parties repeat the allegations in paragraphs 1 through 42 as if fully set

forth herein.

44.      Pursuant to the Original Letter Agreement, the Trump Parties incurred obligations to DLJ, including the Transaction Fee and the Expense Reimbursement Obligations, in excess of $30 million in value (in the aggregate, the "Original Letter Agreement Obligations").

45.      The Trump Parties did not receive fair consideration or reasonably equivalent value in exchange for incurring the Original Letter Agreement Obligations.

46.      The Trump Parties incurred the Original Letter Agreement Obligations within one year before the Petition Date.

47.      The Original Letter Agreement Obligations were incurred for no consideration, or less than fair consideration or reasonably equivalent value, at a time when (i) the Trump Parties were insolvent or, as a result of the Original Letter Agreement Obligations, became insolvent, or (ii) the Trump Parties were engaged in a business for which their remaining assets constituted unreasonably small capital.

48.      As a direct and proximate result of the Original Letter Agreement, the Debtor and its creditors incurred liabilities in an amount at least equal to the amount of the Transaction Fee and the Expenses.

49.      DLJ is the entity for whose benefit the Original Letter Agreement was executed.

50.      By reason of the foregoing, the Trump Parties are entitled to judgment avoiding, recovering, and preserving for the Debtors' estates the Original Letter Agreement Obligations or the value thereof and disallowing and expunging the DLJ Claims.

**SECOND CAUSE OF ACTION AND SECOND OBJECTION TO DLJ CLAIMS**
**Fraudulent Transfer – Original Letter Agreement Obligations**
**Bankruptcy Code Sections 544, 550, 551, and Applicable State Law**

51.      The Trump Parties repeat the allegations in paragraphs 1 through 50 as if fully set forth herein.

17

52.     Pursuant to the Original Letter Agreement, the Trump Parties incurred obligations to DLJ, including the Transaction Fee and the Expense Reimbursement Obligations, in excess of $30 million in value (in the aggregate, the "Letter Agreement Obligations").

53.     The Trump Parties did not receive fair consideration or reasonably equivalent value in exchange for the Trump Parties (other than THCR Holdings) having incurred the Original Letter Agreement Obligations.

54.     The Trump Parties incurred the Original Letter Agreement Obligations within one year before the Petition Date.

55.     At all times relevant hereto, there were actual creditors of the Trump Parties holding unsecured claims allowable against the Debtor's estate within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code.  Such creditors have the right to avoid the Original Letter Agreement under applicable state laws, including 6 Del. C. § 1301 *et seq.* and N.J. Stat. Ann. § 25:2-20 *et seq.*

56.     The Original Letter Agreement Obligations were incurred for no consideration, or less than fair consideration or reasonably equivalent value, at a time when (i) the Trump Parties were insolvent or, as a result of the Original Letter Agreement Obligations, became insolvent, or (ii) the Trump Parties were engaged in a business for which their remaining assets constituted unreasonably small capital.

57.     As a direct and proximate result of the Original Letter Agreement, the Debtor and its creditors incurred liabilities in an amount at least equal to the amount of the Transaction Fee and the Expenses.

58.     The Original Letter Agreement and Original Letter Agreement Obligations are subject to avoidance by a creditor that extended credit to the Trump Parties and obtained a judicial lien therefor on the Petition Date.

59.     DLJ is the entity for whose benefit the Original Letter Agreement was executed.

18

60.     By reason of the foregoing, the Trump Parties are entitled to judgment avoiding, recovering, and preserving for the Debtors' estates the Original Letter Agreement Obligations or the value thereof and disallowing and expunging the DLJ Claims.

### THIRD CAUSE OF ACTION AND THIRD OBJECTION TO DLJ CLAIMS
### Fraudulent Transfer – Amended Letter Agreement Obligations
### Bankruptcy Code Sections 548, 550, 551

61.     The Trump Parties repeat the allegations in paragraphs 1 through 60 as if fully set forth herein.

62.     Pursuant to the Amended Letter Agreement, THCR or all of the Trump Parties incurred obligations to DLJ that included a seven-month extension of the Tail Period in which the occurrence of an Alternative Transaction could entitle DLJ to the Transaction Fee, and increased obligations to reimburse DLJ for expenses (the "Amended Letter Agreement Obligations").

63.     The Trump Parties did not receive fair consideration or reasonably equivalent value in exchange for incurring the Amended Letter Agreement Obligations.

64.     The Trump Parties incurred the Amended Letter Agreement Obligations within one year before the Petition Date.

65.     The Amended Letter Agreement Obligations were incurred for no consideration, or less than fair consideration or reasonably equivalent value, at a time when (i) the Trump Parties were insolvent or, as a result of the Amended Letter Agreement Obligations, became insolvent, or (ii) the Trump Parties were engaged in a business for which their remaining assets constituted unreasonably small capital.

66.     As a direct and proximate result of the Amended Letter Agreement, THCR or all of the Trump Parties and their creditors incurred liabilities in an amount at least equal to the amount of the Transaction Fee and the Expenses.

67.     DLJ is the entity for whose benefit the Amended Letter Agreement was executed.

19

68.    By reason of the foregoing, the Trump Parties are entitled to judgment avoiding, recovering, and preserving for the Debtors' estates the Amended Letter Agreement Obligations or the value thereof and disallowing and expunging the DLJ Claims.

**FOURTH CAUSE OF ACTION AND FOURTH OBJECTION TO DLJ CLAIMS**
**Fraudulent Transfer – Amended Letter Agreement Obligations**
**Bankruptcy Code Sections 544, 550, 551 and Applicable State Law**

69.    The Trump Parties repeat the allegations in paragraphs 1 through 68 as if fully set forth herein.

70.    Pursuant to the Amended Letter Agreement, THCR or all of the Trump Parties incurred obligations to DLJ that included a seven-month extension of the Tail Period in which the occurrence of an Alternative Transaction could entitle DLJ to the Transaction Fee, and increased obligations to reimburse DLJ for expenses (the "Amended Letter Agreement Obligations").

71.    The Trump Parties did not receive fair consideration or reasonably equivalent value in exchange for incurring the Amended Letter Agreement Obligations.

72.    The Trump Parties incurred the Amended Letter Agreement Obligations within one year before the Petition Date.

73.    At all times relevant hereto, there were actual creditors of the Trump Parties holding unsecured claims allowable against the Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code.  Such creditors have the right to avoid the Original Letter Agreement under applicable state laws, including 6 Del. C. § 1301 *et seq.* and N.J. Stat. Ann. § 25:2-20 *et seq.*

74.    The Amended Letter Agreement Obligations were incurred for no consideration, or less than fair consideration or reasonably equivalent value, at a time when (i) the Trump Parties were insolvent or, as a result of the Amended Letter Agreement Obligations, became

20

insolvent, or (ii) the Trump Parties were engaged in a business for which their remaining assets constituted unreasonably small capital.

75.     As a direct and proximate result of the Amended Letter Agreement, the Trump Parties and their creditors incurred liabilities in an amount at least equal to the amount of the Transaction Fee and the Expenses.

76.     The Amended Letter Agreement and Amended Letter Agreement Obligations are subject to avoidance by a creditor that extended credit to THCR or all of the Trump Parties and obtained a judicial lien therefor on the Petition Date.

77.     DLJ is the entity for whose benefit the Amended Letter Agreement was executed.

78.     By reason of the foregoing, the Trump Parties are entitled to judgment avoiding, recovering, and preserving for the Debtors' estates the Amended Letter Agreement Obligations or the value thereof and disallowing and expunging the DLJ Claims.

### FIFTH CAUSE OF ACTION
### Fraudulent Escrow Transfer
### Bankruptcy Code Sections 548, 550, 551

79.     The Trump Parties repeat the allegations in paragraphs 1 through 78 as if fully set forth herein.

80.     On or about August 16, 2004, the Trump Parties transferred the Escrow Amount of $2,379,966 into an account at U.S. Bank, National Association ("U.S. Bank") for the benefit of DLJ (the "Fraudulent Escrow Transfer").  On September 23, 2004, DLJ sent a letter to U.S. Bank (the "Letter of Instruction") that directed U.S. Bank to release the Escrow Amount to DLJ. The Letter of Instruction directed U.S. Bank to wire the Escrow Amount to Citibank "for the Account of Credit Suisse First Boston."  Upon information and belief, U.S. Bank complied with DLJMB's Letter of Instruction.

81.     THCR and/or all of the other Trump Parties did not receive any consideration, or fair consideration, or reasonably equivalent value in exchange for the Fraudulent Escrow Transfer.

82.     The Fraudulent Escrow Transfer occurred within one year before the Petition Date.

83.     At the time of the Fraudulent Escrow Transfer, THCR and/or all of the Trump Parties were insolvent or as a result of the Fraudulent Escrow Transfer, became insolvent, or (ii) THCR and/or all of the Trump Parties were engaged in a business for which their remaining assets constituted unreasonably small capital, and/or (iii) believed they would incur debts that would be beyond their ability to pay as such debts matured.

84.     The Fraudulent Escrow Transfer is therefore avoidable under section 548 of the Bankruptcy Code.

85.     To the extent that the Fraudulent Escrow Transfer is avoided under section 548 of the Bankruptcy Code, then pursuant to section 550 of the Bankruptcy Code, to the extent not limited by the DLJ Stipulation, THCR and/or the Trump Parties may recover from the initial transferee or beneficiary, or from any immediate or mediate transferee, the property transferred or the value of such property for the benefit of the Trump Parties' estates.

### SIXTH CAUSE OF ACTION
### Fraudulent Escrow Transfer
### Bankruptcy Code Sections 544, 550, 551, and Applicable State Law

86.     The Trump Parties repeat the allegations in paragraphs 1 through 85 as if fully set forth herein.

87.     On or about August 16, 2004, the Trump Parties transferred the Escrow Amount of $2,379,966 into an account at U.S. Bank for the benefit of DLJ (the "Fraudulent Escrow Transfer").  On September 23, 2004, DLJ sent to U.S. Bank the Letter of Instruction directing U.S. Bank to release the Escrow Amount to DLJ.  The Letter of Instruction directed U.S. Bank to

wire the Escrow Amount to Citibank "for the Account of Credit Suisse First Boston."  Upon

information and belief, U.S. Bank complied with DLJMB's Letter of Instruction.

88.     At all times relevant hereto, there were actual creditors of the Trump Parties

holding unsecured claims allowable against the Debtors' estates within the meaning of Sections

502(d) and 544(b) of the Bankruptcy Code.  Such creditors have the right to avoid the Fraudulent

Escrow Transfer under applicable state fraudulent conveyance and fraudulent transfer laws,

including 6 Del. C. § 1301 *et seq.* and N.J. Stat. Ann. § 25:2-20 *et seq.*

89.     At the time of the Fraudulent Escrow Transfer, THCR and/or all of the Trump

Parties were insolvent or as a result of the Fraudulent Escrow Transfer, became insolvent, or (ii)

THCR and/or all of the Trump Parties were engaged in a business for which their remaining

assets constituted unreasonably small capital, and/or (iii) believed they would incur debts that

would be beyond their ability to pay as such debts matured.

90.     The Fraudulent Escrow Transfer is subject to avoidance by a creditor that

extended credit to THCR and/or all of the Trump Parties and obtained a judicial lien therefor on

the Petition Date.

91.     The Fraudulent Escrow Transfer is therefore avoidable under section 544 of the

Bankruptcy Code and applicable state fraudulent conveyance and fraudulent transfer laws.

92.     To the extent that the Fraudulent Escrow Transfer is avoided under section 544 of

the Bankruptcy Code, then pursuant to section 550 of the Bankruptcy Code, to the extent not

limited by the DLJ Stipulation, THCR and/or all of the Trump Parties may recover from the

initial transferee or beneficiary, or from any immediate or mediate transferee, the property

transferred or the value of such property for the benefit of the Trump Parties' estates.

**SEVENTH CAUSE OF ACTION AND FIFTH OBJECTION TO DLJ CLAIMS**
**Disallowance of Claims Under Bankruptcy Code Section 502(d)**

93.     The Trump Parties repeat the allegations in paragraphs 1 through 92 as if fully set

forth herein.

94.     By reason of the foregoing facts and pursuant to Bankruptcy Code section 502(d),

the DLJ Claims must be disallowed unless and until DLJ has turned over to the Trump Parties

the property transferred, or paid the Trump Defendants the value of such property, for which

DLJ is liable under Bankruptcy Code section 550.

**EIGHTH CAUSE OF ACTION AND SIXTH OBJECTION TO DLJ CLAIMS**
**Fraud in the Inducement**

95.     The Trump Parties repeat the allegations in paragraphs 1 through 94 as if fully set

forth herein.

96.     The Trump Parties were fraudulently induced to incur their alleged obligations to

DLJ by DLJ's false and misleading representations that it would pursue consummation of a

restructuring transaction in good faith.

97.     DLJ mislead the Debtors into believing that it intended to pursue a restructuring

transaction in good faith to induce the Debtors to enter into the August 2004 Agreements, and

possibly also the Original Letter Agreement, in order to line its pockets with huge and totally

underserved fees.

98.     By inducing the Trump Parties to enter into the August 2004 Agreements, DLJ

harmed the Debtors by preventing them from soliciting genuine restructuring transactions -- with

parties who might have made a good faith effort to consummate them rather than just use non-

binding discussions as an excuse to extract claims for millions of dollars of fees -- at the time

that insolvency and illiquidity posed the greatest threat to the Debtors' future and ability to repay

creditors.

99.     DLJ knew or should have known that the Trump Parties would rely upon its misrepresentations in determining to enter into the Letter Agreements, the Exclusivity Agreements and the Escrow Agreements.

100.     The Trump Parties would not have executed the Letter Agreements, the Exclusivity Agreements or the Escrow Agreement, and there would have been no basis for DLJ to assert the DLJ Claims, if DLJ had not fraudulently or negligently misled the Trump Parties to believe that it would use its best efforts and act in good faith to pursue a restructuring transaction of the type discussed by the parties.

101.     The DLJ Claims should therefore by disallowed and expunged, and the Trump Parties should be awarded damages to the greatest extent permitted by the DLJ Stipulation.

### SEVENTH OBJECTION TO DLJ CLAIMS
### No Basis - Only THCR Has Potential Payment Obligations Under the Documents

102.     The Trump Parties repeat the allegations in paragraphs 1 through 101 as if fully set forth herein.

103.     Pursuant to paragraph 1 of the Amended Letter Agreement, each of the Original Letter Agreements was amended to make THCR the only Trump Party that could be obligated to pay the Expenses.

104.     Pursuant to paragraph 2 of the Amended Letter Agreement, each of the Original Letter Agreements was amended to make THCR the only Trump Party that could be obligated to pay the Transaction Fee.

105.     Accordingly, there is no basis for the DLJ Claims that are asserted against Trump Plaza Associates, Taj Mahal, TAC, and TCH (Proofs of Claim numbered 1909, 1910, 1911 and 1912), and such claims therefore should be disallowed and expunged in their entirety.

106.     In the event that the Court should determine that DLJ Claims numbers 1909 through 1912 are not meritless by reason of the Amended Letter Agreement, then DLJ Claims

numbers 1909 through 1912 should be disallowed on the grounds that they are duplicative of

DLJ Claim number 1645.

## EIGHTH OBJECTION TO DLJ CLAIMS
### No Basis -- Agreements Unenforceable for Lack of Consideration

107.    The Trump Parties repeat the allegations in paragraphs 1 through 106 as if fully

set forth herein.

108.    The Letter Agreements are not enforceable, binding agreements because they are

devoid of any consideration running from DLJ to the Trump Parties.  Because the DLJ Claims

are based in their entirety upon the obligations set forth in the Letter Agreements, which are not

enforceable, the DLJ Claims should be disallowed and expunged.

## NINTH CAUSE OF ACTION AND NINTH OBJECTION TO DLJ CLAIMS
### Breach of Implied Covenants of Good Faith and Fair Dealing

109.    The Trump Parties repeat the allegations in paragraphs 1 through 108 as if fully

set forth herein.

110.    In the event the Letter Agreements are valid and enforceable contracts between

the Trump Parties and DLJ, DLJ was subject to the duty of good faith and fair dealing that is

implied under all express contracts.

111.    The Letter Agreements, the Exclusivity Agreements and the Escrow Agreement

left the Trump Parties dependant upon DLJ to negotiate and work in good faith toward

finalization, documentation, and consummation of a restructuring transaction with the Trump

Parties.

112.    DLJ knew that by insisting that the Trump Parties execute the Exclusivity

Agreements and the Letter Agreements, DLJ had given itself the ability to impair the Trump

Parties' ability to reorganize by failing to negotiate and seek to consummate a restructuring

transaction in good faith while also preventing or limiting the Trump Parties from soliciting offers from, and negotiating with, other parties.

113.    DLJ knew that it could assert claims for as much as $30 million that would be unearned and undeserved if DLJ violated its duties of good faith and fair dealing by refusing to negotiate in good faith and consummate a restructuring transaction with the Trump Parties after having caused them to execute the one-sided and unconscionable Letter Agreements.

114.    Absent DLJ's obligation to perform in good faith, the Trump Parties were left completely at the mercy of DLJ by the Exclusivity Agreement and the Letter Agreements.

115.    DLJ breached its implied covenants of good faith and fair dealing by terminating discussions with the Trump Parties, without any cause, just weeks after inducing the Trump Parties to execute the August 2004 Agreements by indicating that it would continue to pursue a restructuring transaction with the Trump Parties in good faith.

116.    DLJ's breach of its implied covenants of good faith and fair dealing harmed the Debtors by forcing them to assemble an alternative reorganization transaction on limited notice and with substantially weakened negotiating leverage, which eventually resulted in the Debtors entering into a reorganization transaction that provided materially less value to the Debtors than the Proposed Restructuring Transaction.

117.    DLJ is not entitled to the Transaction Fee and the Expenses, because it had breached the Letter Agreements and the Exclusivity Agreements by failing to pursue a restructuring transaction with the Trump Parties in good faith.

118.    The DLJ Claims should therefore be disallowed and expunged.

## TENTH OBJECTION TO DLJ CLAIMS
### No Basis - No Alternative Transaction Occurred

119.    The Trump Parties repeat the allegations in paragraphs 1 through 118 as if fully set forth herein.

120.    Even if the Letter Agreements should be found to be enforceable, DLJ is not

entitled to the Transaction Fee because an "Alternative Transaction" did not occur in accordance

with the terms of the Original Letter Agreement as a result of the failure of at least two

conditions.  First, the Original Letter Agreement requires that for a transaction to qualify as an

Alternative Transaction, it must be "consummated out-of-court or through a bankruptcy

proceeding, **without the participation of DLJ** or any of its affiliates (other than CSFB and its

affiliates in connection with advisory or financing affiliates)."  (Emphasis supplied.)

121.    As set forth in paragraphs 37 through 41 above, DLJ participated actively and

extensively in the Trump Parties' bankruptcy proceedings, including the portions of the

proceedings that related directly to the consummation of the Trump Parties' reorganization

transaction, such as the plan confirmation process, by *inter alia*, appearing in the case, filing

substantive objections, issuing notices of deposition, attending depositions, and filing proofs of

claim.   In addition, upon information and belief, DLJ and/or its affiliates or successors

participated in the reorganization transaction itself by receiving distributions of cash, New Notes

and New Common Stock (each as defined in the Plan) under the Plan as a holder of THC Second

Priority Notes Claims.

122.    Because the Debtors' reorganization was not "consummated out-of-court or

through a bankruptcy proceeding, without the participation of DLJ or any of its affiliates," an

"Alternative Transaction" did not occur under the terms of the Letter Agreements and no

"Transaction Fee" is due to DLJ under the terms of the Original Letter Agreement.

123.    Second, the Original Letter Agreement requires that a transaction must:

> have (x) a value in excess of $200 million to the Company, any of its
> subsidiaries, or any of its controlled affiliates, it being understood that for
> such purposes, value shall mean the aggregate dollar amount of proceeds
> received and net indebtedness assumed, forgiven or compromised or (y)
> shall result in the ownership of more than 50% of the voting stock [ ] or
> control of the board of directors of any subsidiary or controlled affiliate of
> the Company with an asset fair market value of in excess of $200 million.

if it is to qualify as an Alternative Transaction (the "Minimum Value Requirement").

124.    The reorganization transaction consummated by the Debtors did not have a value in excess of $200 million to the Company under the terms of the Letter Agreements or otherwise satisfy the Minimum Value Requirement.  As set forth in the Disclosure Statement, the only classes of claims that did not receive an estimated 100% recovery were TAC Notes Claims, TCH Second Priority Notes Claims, and DJT Notes Claims, whose respective estimated recoveries were 93.2%, 95.5%, 90%.  The "net indebtedness assumed, forgiven or compromised" through the Plan, computed by applying the foregoing recovery percentages to the face amount of the respective classes of claims, was approximately $92.5 million.

125.    The "amount of proceeds received" under the Plan consisted of a $55 million equity investment by Donald J. Trump.  Together with the "net indebtedness assumed, forgiven or compromised," the aggregate value to the company of the reorganization transaction, as computed in accordance with the formula set forth in the Original Letter Agreement, was approximately $147.5 million, and in all events substantially less than $200 million.  The value of the reorganization transaction thus did not meet the $200 million Minimum Value Requirement.  Accordingly, the reorganization transaction did not qualify as an Alternative Transaction under the Original Letter Agreement, and DLJ is not entitled to the Transaction Fee.

126.    The Amended Letter Agreement did not alter the definition of an Alternative Transaction or the criteria and condition that must be satisfied for an Alternative Transaction to be deemed to have occurred, except for having lengthened the Tail Period.  Therefore, because no Alternative Transaction occurred in accordance with the terms of the Original Letter Agreement, no Alternative Transaction occurred in accordance with the terms of the Amended Letter Agreement, DLJ is not entitled to the Transaction Fee, even in the event the Court should determine that either or both Letter Agreements are binding and enforceable.

127.    In the event that the Court declares that only the Amended Letter Agreement is void, unenforceable or avoided, an additional reason DLJ would not be entitled to the Transaction Fee is that no qualifying Alternative Transaction occurred within the time limitation of the Tail Period, which expired on December 1, 2004 under the Original Letter Agreement.

128.    The DLJ Claims therefore should be reduced and disallowed by no less than $25 million.

## ELEVENTH OBJECTION TO DLJ CLAIMS
### Mandatory Subordination - Bankruptcy Code Section 510(b)

129.    The Trump Parties repeat the allegations in paragraphs 1 through 128 as if fully set forth herein.

130.    The DLJ Claims arise from a transaction pursuant to which DLJ was to purchase approximately 68.7% of the common shares of THCR.

131.    Each of the DLJ Claims is a "claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor [or] for damages arising from the purchase or sale of such a security" which must be "subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock" pursuant to 11 U.S.C. § 510(b).

132.    By reason of the foregoing, the Trump Parties are entitled to judgment subordinating the DLJ Claims under section 510(b) of the Bankruptcy Code to the same priority as the prepetition common stock interests of THCR, and reclassifying the DLJ Claims as Class 11 Old THCR Common Stock Equivalents under the Confirmed Plan.

## TWELFTH OBJECTION TO DLJ CLAIMS
### Unclean Hands, Unconscionability

133.    The Trump Parties repeat the allegations in paragraphs 1 through 132 as if fully set forth herein.

134.    The Letter Agreements are void and unenforceable on the grounds that they are unconscionable.

135.    The DLJ Claims are barred by DLJ's own unclean hands and lack of good faith in connection with the Letter Agreements, the Exclusivity Agreements, the Escrow Agreement, and its failure to pursue a restructuring transaction with the Trump Parties after misleading them to believe it would do so.

136.    The DLJ Claims should therefore be expunged and disallowed.

## THIRTEENTH OBJECTION TO DLJ CLAIMS
### Claims Subject to Setoff

137.    The Trump Parties repeat the allegations in paragraphs 1 through 136 as if fully set forth herein.

138.    The foregoing Causes of Action entitle the Trump Parties to damages from DLJ that exceed the value of the DLJ Claims and offset any monies that might be due from the Trump Parties to DLJ in their entirety.

## VI.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, the Trump Parties respectfully request the Court to enter judgment in their favor as follows:

A.      Avoiding and setting aside the obligations set forth in the Letter Agreements as fraudulently incurred obligations;

B.      Declaring that any and all obligations of the Trump Parties set forth in the Letter

Agreements are unenforceable and nonbinding because they are unsupported by adequate

consideration;

C.      Avoiding the Fraudulent Escrow Transfer and directing DLJ to turn over the

Fraudulent Escrow Transfer, or its value, to the Trump Debtors' estates to the fullest extent

permitted by the DLJ Escrow Agreement;

D.      Declaring that DLJ is not entitled to the Transaction Fee under the terms of the

Letter Agreements because an "Alternative Transaction" did not occur in accordance with the

terms of the Letter Agreements;

E.      Declaring that DLJ is not entitled to the Transaction Fee or the Expenses because

it induced the Trump Parties to enter into the Letter Agreements through negligent or fraudulent

misrepresentations, rendering the Letter Agreements void and unenforceable;

F.      In the alternative, declaring that DLJ breached the Letter Agreements;

G.      Expunging and disallowing the DLJ Claims in their entirety on the basis of any or

all of the foregoing;

H.      Expunging and disallowing DLJ Claims numbers 1909 through 1912 on the

grounds that there is no basis for DLJ to assert claims against any entity other than THCR, or

alternatively, disallowing such claims as duplicative of DLJ Claim number 1645.

I      Pursuant to 11 U.S.C. § 510(b), subordinating any portion of the DLJ Claims that

is not disallowed or expunged to be equal in priority to, and provided the treatment of, old THCR

common stock equivalents under the Plan;

J.      Declaring that the transfers and conveyances to DLJ that are avoidable pursuant to

11 U.S.C. §§ 544, 548, and 550, and applicable state law result in the mandatory disallowance of

any and all claims of DLJ pursuant to 11 U.S.C. § 502(d) unless and until DLJ returns all such

transfers or their value to the Debtors' estates;

K.     For damages to the extent permitted by the DLJ Stipulation, and in an amount to

be proved at trial;

L.     For punitive damages;

M.     For prejudgment interest;

N.     For attorneys' fees and costs, and costs of suit; and

O.     For such other and further relief as this Court deems just and proper.

**The Trump Parties hereby reserve their rights to assert any of the foregoing claims for**

**relief, or any additional claims, against CSFB, as to which the DLJ Stipulation does not**

**limit liability.**

Dated:  October 6, 2005                    Respectfully submitted,
                                           TRUMP HOTELS AND CASINO RESORTS, INC., *et al.*,
                                           Reorganized Debtors
                                           By:

                                           */s/ Charles A. Stanziale, Jr.*
                                           McELROY, DEUTSCH, MULVANEY
                                           & CARPENTER, LLP
                                           Charles A. Stanziale, Jr.
                                           Jeffrey T. Testa
                                           Three Gateway Center, 100 Mulberry Street
                                           Newark, NJ 07102
                                           Telephone:  (973) 622-7711
                                           Telecopy:  (973) 622-5314

                                                  -and-
                                           KASOWITZ, BENSON, TORRES &
                                           FRIEDMAN LLP
                                           David M. Friedman
                                           Robert M. Novick
                                           Jeffrey R. Gleit
                                           1633 Broadway
                                           New York, NY 10019
                                           Telephone:  (212) 506-1700
                                           Telecopy:  (212) 506-1800

                                           *Counsel for Reorganized Debtors*